UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WHITNEY TAYLOR, <br><br> Plaintiff, <br><br> vs. <br><br> VIMEO INC., PHILIP MOYER, GLENN SCHIFFMAN, ADAM GROSS, ALESIA J. HAAS, JAY HERRATTI, IDA KANE, MO KOYFMAN, and ALEXANDER VON FÜRSTENBERG, <br><br> Defendants. | Case No. 25-cv-12343 |

## COMPLAINT

Plaintiff Whitney Taylor ("Plaintiff"), by and through counsel, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against Vimeo, Inc. ("Vimeo" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Vimeo, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed acquisition of Vimeo by Bending Spoons US Inc. ("Parent"), Bloomberg Merger Sub Inc. ("Merger

1

Sub"), and Bending Spoons S.p.A. (together with Parent and Merger Sub, "Bending Spoons").

2.     On or about September 10, 2025, Vimeo entered into an agreement and plan of merger (the "Merger Agreement"), whereby Bending Spoons will acquire Vimeo (the "Proposed Transaction") and shareholders of Vimeo common stock will receive $7.85 in cash for each share of Vimeo common stock they own (the "Merger Consideration").

3.     On or about October 6, 2025, in order to convince shareholders to support the Proposed Transaction, the Board authorized the filing of a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") with the Securities and Exchange Commission ("SEC"). As detailed below, the Proxy Statement is materially incomplete and misleading with respect to: (i) the financial fairness of the Proposed Transaction, and (ii) the potential conflicts of interest that may have tainted the work performed by Vimeo financial advisor Allen & Company ("Allen & Co.") and the fairness opinion that Allen & Co. provided.

4.     The special meeting at which Vimeo shareholders will cast their votes on the Proposed Transaction (the "Special Meeting") will be scheduled and the definitive proxy statement that will be used to solicit votes on the Proposed Transaction will be sent to Vimeo shareholders shortly. It is imperative that the material information that has been omitted from the Proxy Statement be disclosed immediately so public stockholders may have time to consider the information that has been omitted and misrepresented in the Proxy Statement and make a fully and fairly informed determination as to how to vote.

5.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction, unless and until the material information discussed below is disclosed to Vimeo's shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

6.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

8.     Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2) because Defendants are subject to personal jurisdiction in this District, Defendants' and Parent's legal advisors maintain offices in this District, and shareholders of the Company reside in this District so Defendants were aware that the Proxy Statement would be reviewed in this District.  *See Sarantakis v. Gruttadauria*, No. 02 c 1609, 2003 U.S. Dist. LEXIS 4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district."); *see also Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be

transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in the Wall Street Journal that was circulated in Salt Lake City, Utah).

## **PARTIES**

9.     Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of Vimeo common stock.

10.     Defendant Vimeo a publicly traded Delaware corporation and an innovative video experience platform that allows millions of users to create high-quality video experiences and bring ideas to life, with Vimeo's users' videos receiving billions of views each month.  Vimeo's common stock trades on the Nasdaq Global Select Market (the "Nasdaq") under the ticker symbol "VMEO."

11.     Defendant Philip Moyer ("Moyer") is Vimeo's Chief Executive Officer and a director of the Company.

12.     Defendant Glenn Schiffman ("Schiffman") is the Chairman of the Board of Directors of the Company.

13.     Defendant Adam Gross ("Gross") is a director of the Company.

14.     Defendant Alesia J. Haas ("Haas") is a director of the Company.

15.     Defendant Jay Herratti ("Herratti") is a director of the Company.

16.     Defendant Ida Kane ("Kane") is a director of the Company.

17.     Defendant Mo Koyfman ("Koyfman") is a director of the Company.

18.     Defendant Alexander von Fürstenberg ("von Fürstenberg") is a director of the Company.

19.     The defendants identified in paragraphs 11 through 17 are collectively referred to as

the "Individual Defendants" or the "Board."

**SUBSTANTIVE ALLEGATIONS**

**A.** **Background of the Proposed Transaction**

20.     Defendant Vimeo a publicly traded Delaware corporation and an innovative video experience platform that allows millions of users to create high-quality video experiences and bring ideas to life, with Vimeo's users' videos receiving billions of views each month. Vimeo's common stock trades on the Nasdaq Global Select Market (the "Nasdaq") under the ticker symbol "VMEO."

21.     During the second half of 2020, former Vimeo parent company IAC/InterActiveCorp ("IAC") discussed spinning off Vimeo.

22.     On November 5, 2020, Vimeo and IAC entered into an investment agreement with certain investors and IAC director, senior executive, and stockholder Barry Diller and IAC's then-chief executive officer Joseph Levin also entered into a voting agreement (the "IAC Voting Agreement"), whereby Mr. Diller agreed, among other things, to vote his shares in favor of electing Mr. Levin as a member of the IAC board at each stockholder meeting at which Mr. Levin was standing for such election and Mr. Diller and Mr. Levin agreed to coordinate with each other as to how Diller's shares should be voted on certain matters, including, among other things, material acquisitions and dispositions of any assets or business.

23.     The IAC Voting Agreement included a binding arbitration agreement that provided that any disputes relating to performance 'shall be settled by arbitration in New York, New York before Herb Allen III (the "Designated Arbitrator")[.]"

24.     On December 7, 2020 Mr. Diller informed the rest of the IAC board at its December 7, 2020 meeting that the holders of IAC Class B common stock would support a spin-off of Vimeo as long as public Vimeo would have a dual class capital structure replicating that of IAC, ensuring

that Diller's voting rights continued to far exceed his economic rights.

25.     At the same meeting, the IAC board received a presentation from Allen & Co., a "long-time financial advisor to IAC and Old IAC, regarding a potential spin-off of Vimeo," which "reviewed the potential benefits and risks of the transaction to IAC and to an independent Vimeo," outlined certain risks that "could be mitigated by investor engagement and initial involvement by a limited number of IAC directors or officers on the Vimeo board," and "express[ed] the view that a dual class capital structure at Vimeo would provide a number of benefits[.]"

26.     Although it is not clear which representatives of Allen & Co. provided this presentation, the president of Allen & Co., IAC's "long-time financial advisor," is Herb Allen III, who also sits on the board of directors of Coca Cola, alongside Mr. Diller.

27.     Consistent with Allen & Co.'s view that "investor engagement and initial involvement by a limited number of IAC directors or officers" might help mitigate certain risks associated with a Vimeo spinoff, Vimeo's board to this day continues to include overlap with directors and officers of IAC.  For example, Vimeo directors Glenn Schiffman, Jay Herratti, and Mo Koyfman previously held leadership positions at IAC, and Vimeo director Alexander von Fürstenberg is an IAC director.

28.     Indeed, the proxy statement that Vimeo issued in connection with its most recent annual meeting identified IAC as "a related party pursuant to our related party transaction policy because of the relationships between IAC and certain of our current and former directors, including Mr. Levin, Mr. Diller, and Mr. von Fürstenberg."

29.     In January 2024, Bending Spoons expressed interest in acquiring Vimeo.

30.     In response to this interest, Vimeo engaged Allen & Co. to act as a financial advisor in connection with a potential sale of Vimeo, authorizing Allen & Co. to engage in outreach to third

parties.

31.    However, Vimeo terminated this process in March 2024.

32.    In July 2025, Bending Spoons once again expressed interest in acquiring Vimeo, this time at Allen & Co's Sun Valley conference, which was attended by Mr. Diller and Mr. von Fürstenberg.

33.    Allen & Co. was engaged in advisory work for Bending Spoons at the time but agreed to suspend this work in light of Bending Spoons' interest in acquiring Vimeo.

34.    During the next two months, Vimeo and Bending Spoons negotiated the terms of the Proposed Transaction.

**B.    The Proposed Transaction and the Issuance of the Materially Incomplete and Misleading Proxy Statement**

35.    On or about September 10, 2025, Vimeo issued joint press release to announce the Proposed Transaction, stating in part:

**Vimeo Enters into Definitive Agreement to Be Acquired by Bending Spoons for $1.38 Billion**

Vimeo stockholders to receive $7.85 per share in cash
Bending Spoons reinforces its commitment to innovation in the video platform market

NEW YORK, Sept. 10, 2025 (GLOBE NEWSWIRE) – Vimeo, Inc. (NASDAQ: VMEO), a leading video platform for business, today announced that it has entered into a definitive agreement to be acquired by Bending Spoons, in an all-cash transaction valued at approximately $1.38 billion.    Under the terms of the agreement, Vimeo shareholders will receive $7.85 per share in cash for each share of Vimeo capital stock that they own.    The per-share purchase price represents a 91% premium over Vimeo's 60-day volume-weighted average share price as of market close on September 9, 2025.

"After a disciplined review of strategic alternatives, the Board unanimously determined that this all-cash transaction delivers compelling, certain value to Vimeo shareholders and positions the company to accelerate its strategic roadmap as part of Bending Spoons," said Glenn H. Schiffman, Chairman of the Board.

"We're confident they are the right long-term partner for our customers, employees, and brand."

"Bending Spoons has tremendous respect for the Vimeo team, our customers and the creator community we serve," said Philip Moyer, Vimeo CEO. "Luca and his team are committed to expanding our product across all segments: Self-Serve, OTT/Vimeo Streaming, and Vimeo Enterprise. We are excited about this partnership, which we believe will unlock even greater focus for our team and customers as we continue to strive towards our global mission to be the most innovative and trusted video platform in the world for businesses."

"We're looking forward to welcoming Vimeo into the Bending Spoons portfolio," said Luca Ferrari, Bending Spoons CEO and co-founder. "Vimeo is a pioneering brand in the video space, serving a passionate, global community of creators and businesses. At Bending Spoons, we acquire companies with the expectation of owning and operating them indefinitely, and we look forward to realizing Vimeo's full potential as we reach new heights together. In particular, after closing, we're determined to make ambitious investments in the US and other priority markets, and all key areas of the business, spanning both the creator and enterprise offerings. We'll focus on achieving even more stellar levels of performance and reliability, bringing advanced features to more customers, and continuing to release powerful and responsible AI-enabled features."

### Details of the Transaction

The transaction, which was unanimously approved by Vimeo's Board of Directors, is expected to close in the fourth quarter of 2025, subject to customary closing conditions and approvals, including approval by Vimeo's stockholders, and the receipt of required regulatory approvals.

Upon the completion of the transaction, Vimeo will become a privately held company and its capital stock will no longer be listed on any public stock exchange.

### Financial Reporting Update

Vimeo does not currently expect to hold an earnings call for the third quarter of 2025. The Company expects to release written third-quarter earnings results for the third quarter of 2025 in accordance with SEC rules, and to continue meeting its applicable reporting obligations during the pre-close period.

### Advisors

Skadden, Arps, Slate, Meagher & Flom LLP are serving as legal advisors to Vimeo, and Allen & Company LLC as financial advisors.

Latham & Watkins LLP is serving as legal advisor to Bending Spoons. J.P. Morgan and Wells Fargo acted as joint lead financial advisors and BNP acted as financial advisor. EY Advisory SpA and EY SLT provided financial and tax due diligence services.

36.     On or about October 6, 2025, Vimeo, in order to solicit approval to consummate the Proposed Transaction from Vimeo's public shareholders, the Board authorized the filing of the Proxy Statement with the SEC.

37.     The Proxy Statement is materially incomplete and misleading.

**C.     The Materially Incomplete and Misleading Proxy Statement**

38.     The Proxy Statement is materially incomplete and misleading with respect to (i) the financial fairness of the Proposed Transaction, and (ii) the potential conflicts of interest that may have tainted the work performed by Vimeo financial advisor Allen & Company ("Allen & Co.") and the fairness opinion that Allen & Co. provided.

**i.     The Proxy Statement is Materially Incomplete and Misleading as to the Assumptions that Allen & Co. Relied Upon in Performing the Valuation Analyses Underlying Its Fairness Opinion**

39.     The Proxy Statement indicates that Allen & Co. performed a discounted cash flow analysis in connection with its fairness opinion.

40.     The Proxy Statement purports to disclose the financial projections that Allen & Co. relied upon in performing its discounted cash flow analysis:

Certain of the measures included in the long-range plan may be considered non-GAAP financial measures, including Adjusted EBITDA and Unlevered Free Cash Flow. Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by Vimeo may not be comparable to similarly titled amounts used by other companies. The long-range plan does not include any transaction-related expenses.

| | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue ($mm) | 424 | 465 | 518 | 596 | 677 | 759 | 848 | 940 | 1,032 | 1,124 |
| Gross Profit ($mm) | 330 | 366 | 413 | 479 | 543 | 610 | 681 | 755 | 829 | 903 |
| Adjusted EBITDA ($mm)[1] | 45 | 66 | 80 | 110 | 138 | 167 | 197 | 228 | 259 | 286 |
| Unlevered Free Cash Flow ($mm)[2] | 10 | 33 | 51 | 84 | 99 | 119 | 142 | 164 | 184 | 203 |

(1) "Adjusted EBITDA" is a non-GAAP measure that is defined as operating income excluding: (1) stock-based compensation expense; (2) depreciation; (3) amortization of intangible assets; (4) gains and losses recognized on changes in the fair value of contingent consideration arrangements; and (5) restructuring costs associated with exit or disposal activities such as a reduction in force or reorganization. This measure should not be considered as an alternative to measures derived in accordance with GAAP.

(2) "Unlevered Free Cash Flow," which was mathematically derived by Allen & Company from the long-range plan for purposes of its discounted cash flow analysis, is a non-GAAP measure that reflects Adjusted EBITDA, less tax, capital expenditures, change in net working capital and other non-operating items. This measure should not be considered as an alternative to measures derived in accordance with GAAP.

Proxy Statement at 45.

41.    Upon information and belief, the Proxy Statement does not disclose all of the cash flow projections that Allen & Co. relied upon in performing this analysis.

42.    The Proxy Statement indicates that "[t]he implied terminal value of Vimeo was derived by applying to Vimeo's *normalized* unlevered, after-tax free cash flow for the fiscal year ending December 31, 2034 a selected range of perpetuity growth rates of 1.5% to 3.5%." Proxy Statement at 42.

43.    The Proxy Statement indicates that Allen & Co. used the perpetuity growth method to calculate the terminal value and explicitly states that Allen & Co. derived the terminal value from

a "normalized" cash flow projection for the 2034E year, indicating that Allen & Co. did not use the 2034E financial projections on Page 45 of the Proxy Statement to calculate the terminal value.[1]

44.     Because the terminal value was calculated by adding all of the cash flows projected for Vimeo into perpetuity the terminal value has a large impact on the results of the discounted cash flow analysis and even a small change in the run-rate year projection used to calculate the terminal value would materially impact the valuation implied by the discounted cash flow analysis.

45.     The Proxy Statement also fails to define the date that Allen & Co. assumed to be the "present" for purposes of its analysis.

46.     Although Allen & Co.'s opinion is dated September 10, 2025, the 2025E cash flow projections that were disclosed in the Proxy Statement appear to cover the entire year. If the "present" value date for the analysis was the beginning of 2025, Allen & Co.'s analysis may have systematically undervalued the Company by discounting all of its cash flows to more than half a year before Allen & Co.'s analysis was actually performed. If Allen & Co. assumed a present value date that did not encompass the full year cash flow projection for the 2025 year, then the financial projections in the Proxy Statement do not actually disclose the cash flow projection that Allen & Co. used for the 2025 year.

#### ii. The Proxy Statement is Materially Misleading and Incomplete with Respect to Whether Any Material Relationships Existed Between Allen & Co. and IAC During the Two-Year Period Leading Up to the Proposed Transaction

47.     The Proxy Statement is also materially incomplete and misleading because it fails to disclose whether Allen & Co. had any material relationships or received compensation from IAC, an affiliate of Vimeo for whom Allen & Co. is a "long-time financial advisor."

---

[1] See, e.g., IQHoldings, Inc. v. Am. Commer. Lines Inc., C.A. No. 6369-VCL, 2013 Del. Ch. LEXIS 234, at *12 (Del. Ch. Mar. 18, 2013) ("In a given company's life cycle, rote normalization may or may not be appropriate after the traditional five year projection period.").

48.     The Proxy Statement states, in part:

Vimeo selected Allen & Company as Vimeo's financial advisor in connection with the merger based on, among other things, Allen & Company's reputation, experience and familiarity with Vimeo's business and industry. Allen & Company, as part of its investment banking business, is regularly engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, private placements and related financings, negotiated underwritings, secondary distributions of listed and unlisted securities, and valuations for corporate and other purposes. ***As the Vimeo Board of Directors was aware, although Allen & Company was not providing as of, and during the two-year period prior to the date of its opinion had not provided, investment banking services to Vimeo unrelated to the merger for which Allen & Company received compensation, Allen & Company in the future may provide such services to Vimeo and/or its affiliates for which Allen & Company would expect to receive compensation.*** As the Vimeo Board of Directors also was aware, although Allen & Company was not providing investment banking services to Bending Spoons S.p.A. during the pendency of the merger, Allen & Company in the past has provided investment banking services to Bending Spoons S.p.A. and in the future expects to provide such services to Bending Spoons S.p.A. and/or its affiliates, including, during the approximately two-year period prior to the date of its opinion, having acted or acting as a strategic and financial advisor to, and as a placement agent for certain equity financings of, Bending Spoons S.p.A., for which services during such two-year period Allen & Company received aggregate fees of approximately $4.45 million. Additionally, as the Vimeo Board of Directors was aware, a managing director of Allen & Company (who is not a member of the financial advisory team assisting Vimeo in connection with the merger) is a member of the board of directors of Bending Spoons S.p.A. In the ordinary course, Allen & Company as a broker-dealer and certain related entities, directors and officers invest, hold long or short positions and trade, either on a discretionary or non-discretionary basis, for their own or beneficiaries' accounts or for those of Allen & Company's clients, in the debt and equity securities (or related derivative securities) of Vimeo, Bending Spoons S.p.A. and/or their respective affiliates. As the Vimeo Board of Directors was aware, Allen & Company and/or certain related entities and employees hold shares of company common stock (including a managing director who is a member of the financial advisory team assisting Vimeo in connection with the merger who holds such shares through a trust). As the Vimeo Board of Directors also was aware, Allen & Company and/or certain of its affiliates and employees hold certain equity securities (and warrants to purchase equity securities) of Bending Spoons S.p.A. As of September 9, 2025, Allen & Company and/or certain related entities and employees held shares of company common stock representing, based on publicly available information, less than 0.4% of such outstanding shares as of such date and Allen & Company and/or certain of its affiliates and employees held certain equity securities (and warrants to purchase equity securities) of Bending Spoons S.p.A. representing, based on information provided by Bending Spoons S.p.A., approximately 1.25% of the outstanding fully diluted equity

securities of Bending Spoons S.p.A. as of such date (assuming the vesting of all unvested warrants held by Allen & Company). The issuance of Allen & Company's opinion was approved by Allen & Company's opinion committee.

Proxy Statement at 43-44.

49.     Thus, although the Proxy Statement indicates that Allen & Co. did not provide any investment services for which it received compensation from Vimeo during the two-year lookback period and further states that Allen & Co. may provide services to Vimeo and/or its affiliates in the future, it does not state whether Allen & Co. has provided services to Vimeo's affiliates during that two-year lookback period.

50.     This information is obviously material here because Allen & Co. and its affiliates have deep ties to IAC and its affiliates.  Indeed, IAC described Allen & Co. as its "long-time financial advisor" when IAC spun off Vimeo in the first place and Allen & Co. opined that one way to avoid "risk" from spinning off Vimeo was to ensure that IAC affiliates continued to control Vimeo through executive positions at Vimeo and through the dual-class voting structure that allowed Mr. Diller to exercise voting rights that far exceeded his economic stake.

51.     These ties are also evident in that IAC's senior executive and chief executive officer handpicked Herb Allen III (with whom Mr. Diller serves as a director of Coca Cola) to act as arbitrator in the event of disputes about performance under the IAC Voting Agreement.

52.     Because Allen & Co. provided a fairness opinion in connection with the Proposed Transaction, federal regulations required that the Proxy Statement clearly, accurately, and fully "describe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between the outside party, its affiliates, and/or unaffiliated representative and the subject company

or its affiliates." 17 C.F.R. §§ 229.1015(b) (Item 1015), 240.14a-3(a)(1), 240.14a-9, 240.14a-101 Item 14(b)(6); *see also* Financial Regulatory Industry Authority ("Finra") Rule 5150.

53.     The fact that Allen & Co. did not receive compensation from Vimeo during the two-year lookback period does not mean that Allen & Co. did not have "any material relationship" with affiliates of Vimeo in the recent past.  Indeed, the Proxy Statement and Allen & Co.'s fairness opinion appear to limit the disclosure of relationships during the lookback period to relationships with Vimeo even while they acknowledge that Allen & Co. may have future relationships with Vimeo affiliates.

54.     IAC is a Vimeo affiliate.  The Proxy Statement indicates that Mr. Diller controls 100% of Vimeo's Class B common stock and controls 36.2% of Vimeo's voting power, the IAC 2024 annual meeting proxy statement indicated that Mr. Diller controls 100% of IAC Class B common stock and 44.4% of IAC's total voting power, and Vimeo and IAC have themselves acknowledged that they are related entities.

55.     IAC has a long history of interrelated transactions with its other affiliates as well as Vimeo, and Allen & Co. has often been involved in these transactions as a financial advisor to IAC or its affiliates.

56.     For example, in IAC's acquisition of Angie's List, Inc. ("Angie's List") in 2017, Allen & Co. acted as financial advisor to Angie's List and provided a fairness opinion.  In this fairness opinion, Allen & Co. disclosed several IAC engagements in the two-years prior to the 2017 Angie List acquisition, including (i) acting as IAC's lead bookrunning manager during a spin-off involving Match.com's initial public offering and (ii) assisting IAC in effecting certain share repurchases of IAC common stock.

57.     Just this April 2025, IAC spun off Angi to IAC's shareholders.  Although IAC did not publicly identify Allen & Co. or any other financial advisor in its press release announcing this spinoff, Vimeo and IAC have previously identified Allen & Co. as a "long-time financial advisor" to IAC and retained Allen & Co. under very similar circumstances when IAC spun off Match.com and Vimeo.

58.     There is a significant amount of overlap between the executives and directors involved in IAC's Vimeo spinoff and IAC's Angi spinoff.  Indeed, Vimeo itself acknowledged that Angi is also a related entity.

59.     The substantial overlap in governance and management between IAC, Vimeo, and Angi, and the roles that Allen & Co. has played as IAC's "long-time financial advisor," and the precise language in the Proxy Statement excluding Vimeo affiliates like IAC from the material relationships disclosures for the two-year lookback period suggest IAC may have retained Allen & Co. when it spun off Angi in April 2025 and used this precise language to avoid disclosing the full extent of the conflicts that Allen & Co. faced as IAC's "long-time financial advisor."

60.     The fairness opinion that was issued in connection with IAC's acquisition of Angie's List also acknowledged that Allen & Co. had assisted IAC in effecting certain share repurchases of IAC common stock.  The Form 10-Q Quarterly Report that IAC issued to report its financial results for the first quarter of 2025 reported, among other things, that IAC had repurchased 3.9 million shares of its stock for $179.4 million in the aggregate during first quarter 2025.

61.     Again, although IAC did not publicly identify Allen & Co. in connection with these repurchases, the fact that Allen & Co., as IAC's "long-time financial advisor," has "assisted" IAC with similar buybacks in the past, along with the precise language in the Proxy Statement that appears to exclude material relationships with Vimeo affiliates suggests IAC may have engaged

Allen & Co. in a similar capacity in connection with share repurchases during the two-year lookback period.

62.     Allen & Co. also may have  acted in an advisory capacity in the April 2025 resolution of activist investor Arkhouse Management Co. LP ("Arkhosue") engagement with IAC, which resulted in the election of director Tar Brahman to the IAC board of directors.

63.     Thus, it appears that the Proxy Statement may have been worded in such a manner as to conceal certain engagements and potential conflicts between Allen & Co. and Vimeo's affiliates during the relevant two-year look back period.

64.     Further, because the Proxy Statement fails to identify Allen & Co.'s relationships with Vimeo affiliates in the last two-years, Vimeo's public stockholders have no way of knowing whether Vimeo's present selection of Allen & Co. as financial advisor and their ensuing financial analyses in the Transaction were subject to any material conflicts of interest or insider preferences. A company's stockholders must be allowed to evaluate for themselves the financial advisor's fairness opinion in light of the financial advisor's potential conflicts rather than being forced to rely on the directors' determination even when the directors were fully informed about the advisor's potential conflicts throughout the process, especially as significant transactions have occurred in which it can be reasonably assumed that Allen & Co. had, at the minimum, some contact with several of Vimeo's affiliates in the recent past  17 C.F.R. § 229.1015(b)(5); Finra Rule 5150(a)(3).

65.     Even assuming none of Vimeo's affiliates paid Allen & Co. compensation during the two-year lookback period, at the very least, the fact that Allen & Co. is a "long-time financial advisor" to the Vimeo's self-described "related entity" is material information that relates to "the qualifications of [Allen & Co.]" and "the method of selection of [Allen & Co.]."  *See* 17 C.F.R. § 229.1015(b)(2) and (3).

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)

48. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

49. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

50. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

52. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the misleading Proxy, which attempts to minimize the number of shares voting against the Proposed Transaction.

53. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants,

17

by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

54. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

55. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligent, recklessness, or intentional conduct.

56. The Company is also deemed negligent, reckless, or intentional as a result of the Individual Defendants' intent in preparing and reviewing the Proxy.

57. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are

not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

58.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

60.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They

19

were thus directly involved in preparing this document.

62.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

63.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

64.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

65.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies in the Proxy Statement;

B.     Rescinding, to the extent already implemented, the Merger Agreement or any of the

terms thereof, or granting Plaintiff rescissory damages;

      C.     Directing the Defendants to account to Plaintiff for all damages sustained as a result

of their wrongdoing;

      D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

      E.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 7, 2025

**OF COUNSEL**

**ADEMI & FRUCHTER LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
gademi@ademilaw.com
jfruchter@ademilaw.com

*Attorneys for Plaintiff*

**ADEMI & FRUCHTER LLP**

By:  */s/ John D. Blythin*
Shpetim Ademi (Wis. SBN 1026973)
John D. Blythin (Ill. SBN 6281648)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
sademi@ademilaw.com
jblythin@ademilaw.com

*Attorneys for Plaintiff*